# In the United States Court of Federal Claims

|  |  |
|---|---|
| CACI, INC.–FEDERAL,<br><br>    *Plaintiff,*<br><br>v.<br><br>THE UNITED STATES,<br><br>    *Defendant,*<br><br>and<br><br>GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC., and GENERAL DYNAMICS MISSION SYSTEMS, INC.,<br><br>    *Defendant-Intervenors.* | No. 23-324C<br>(Filed: July 6, 2023)<br>(Reissued for publication: July 19, 2023[*]) |

*Robert Kiel Tompkins*, Holland and Knight, LLP, Washington, DC, for Plaintiff.
*Kyle Shane Beckrich*, United States Department of Justice, Washington, DC, for Defendant.
*Noah Benjamin Bleicher*, Jenner and Block, LLP, Washington, DC, for Defendant-Intervenors.

## OPINION

  Before this Court are the parties' cross-motions for judgment on the administrative record. Pl.'s Mot. for J. on the Administrative Record ("Pl.'s Mot."), ECF No. 36; Def.'s Cross-Mot. for J. on the Administrative Record ("Def.'s Mot."), ECF No. 41; Def.-Intervenor's Cross-Mot. for J. on the Administrative Record ("Def.-Int.'s Mot."), ECF No. 42. Plaintiff, CACI Inc.–Federal ("CACI"), claims that there were procedural and substantive defects in the Army's decision to exclude it from the Common Hardware Systems 6th Generation ("CHS-6") competition. Compl. ¶¶ 1, 3, ECF No. 1. It argues that the Army's decision-making process violated the Federal Acquisition Regulations ("FAR") and the Administrative Procedure Act ("APA"). *Id.* Substantively, CACI contends the Army's decision itself was arbitrary and contrary to law. *Id.* In addition, Plaintiff alleges that these violations contravene the Competition in Contracting Act. *Id.*

  Contrary to Plaintiff's assertions, the record indicates that the Army's process was rational, CACI did not suffer undue delay during the investigation, and the Army afforded

---

[*] The Court initially filed this opinion under seal to allow the parties to propose redactions. The Court has incorporated the proposed redactions in this public version of the opinion. Words or phrases that are redacted have been replaced with [ xxxxx ].

Plaintiff a meaningful opportunity to respond to its concerns. Relatedly, the decision itself to exclude CACI for a conflict of interest was neither arbitrary nor contrary to law. As such, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**. Defendant's and Defendant-Intervenors' cross-motions for judgment on the administrative record are **GRANTED**.

## I.   Factual Findings

### A.   Background

CHS-6 is the upcoming, next generation of an Army contract to buy commercial-off-the-shelf computer technology, accessories, and related services. *Id*. at ¶¶ 55–56; Hr'g Tr. (June 22, 2023) at 30:10–13, ECF No. 64 ("[T]his is basically running the Best Buy for the Department of Defense, they sell laptops and phones and tablets and things like that."). The Army plans to award a single indefinite delivery, indefinite quantity contract for the program in August 2023. *Id.* at ¶ 56. The contract will last ten years and has an estimated value of $7.9 billion. *Id.* at ¶ 57.

General Dynamics Mission Systems ("GDMS") or other General Dynamics subsidiaries have been the incumbent contractors on the past four generations of the program: CHS-2 through CHS-5. Administrative Record ("AR") 4180. No other company bid for CHS-5. Compl. ¶ 61. The CHS-5 period of performance began in August 2018 and runs through August 2023. AR 4179–80.

The Army released three requests for information ("RFIs") for the CHS-6 project—on February 14, 2020, January 26, 2021, and July 16, 2021. AR 4185. Draft solicitations followed on January 14 and March 29, 2022. Compl. at ¶ 63. The final solicitation was released October 7, 2022. *Id.* at 64. Contractor proposals were due on November 22, 2022. *Id.* at ¶¶ 64–65. The Army plans to award the new contract in August 2023. *Id.* at ¶ 68.

On October 7, 2022, "[b]arely an hour" before the final solicitation was released, the Army's Contracting Officer ("CO") notified CACI of its exclusion from the procurement for an "unfair competitive advantage." AR 4169, 4185. The CO faulted CACI for consulting with Mr. Breck Tarr, a former Army official involved in the CHS-5 program office. AR 4169–70. Previously, the CO had twice notified CACI about concerns with the company's apparent unfair competitive advantage: once in an April 18, 2022 notice of concern, and again in an August 24, 2022 preliminary determination of exclusion. AR 609, 964.

### B.   Mr. Tarr's Relationship with the Army and CACI

The CO excluded CACI from the CHS-6 competition because it hired Mr. Tarr, a former Army employee who managed the CHS-5 procurement, as an independent contractor to help prepare its bid. AR 4169. The CO found that Mr. Tarr's knowledge and previous access to proprietary GDMS documents gave CACI "at a minimum, an appearance of an unfair competitive advantage." *Id.*

Before working for CACI, Mr. Tarr held leadership positions within the Army's CHS program office from December 2014 through April 2019. AR 633. From January 2016 through April 2019, Mr. Tarr was the product lead running the CHS program office. *Id.* He then spent seven months with the the Program Executive Office Command, Control, Communications Tactical, which oversees the CHS program office. AR 635. While there, he performed a cost

analysis of the CHS-5 contract, which included analyzing proprietary GDMS cost information. AR 495–96.  He retired from the Army in November 2019.  AR 635.  Mr. Tarr says that he tried to schedule "an out-processing ethics debriefing" before his retirement from the government. AR 632.  However, there is no documentation of that alleged effort, and no such meeting occurred.

While serving as product lead of CHS, Mr. Tarr oversaw the cost, schedule, and performance of CHS-5.  AR 1555.  He led the planning team for the transition from CHS-4 to CHS-5, during which time he met on a weekly basis with representatives from Army Contracting Command and GDMS.  AR 492–93.  Current and former GDMS employees described their communications with Mr. Tarr as "oftentimes daily" or "almost daily."  AR 494.  He reviewed and approved task order requests from GDMS, which included proprietary cost, rate, and technical information.  *Id.*  He also had access to "competition sensitive" information about GDMS hardware designs for CHS-5.  *Id.*

In his product lead role, Mr. Tarr chaired the Source Selection Advisory Council ("SSAC") for CHS-5.  AR 736.  He appointed members to the Source Selection Evaluation Board, which was responsible for evaluating GDMS's proposal for the program.  AR 736–37. Mr. Tarr signed an SSAC memo about GDMS's CHS-5 bid that included proprietary cost information.  AR 768–73.  He was included on email negotiations between GDMS and Army Contracting Command employees about the CHS-5 contract.  AR 701.  In one email, an Army Contracting Command official asked him to "chime in" if he had anything to add.  *Id.*  This email was one of many.  AR 551 (cc'ed on October 24, 2017 email attaching GDMS's entire CHS-5 proposal); AR 727 (receiving a June 8, 2018 email attachment titled "Documentation of discussions with GDMS on CHS-5.docx"); AR 731–32 (same document identifying Mr. Tarr as a participant in the discussions, which covered GDMS's reasons for cost increases on CHS); AR 557 (sending June 18, 2018 email to Army Contracting Command to prepare for meeting with GDMS); AR 697 (sending June 24, 2018 email joking with a GDMS employee about the contents of an award); AR 700–01 (cc'ed on a June 19, 2019 email thread with GDMS about warranty pricing schedules for CHS-5); AR 703 (cc'ed on July 5, 2018 email from GDMS that included cost build-up and price schedules); *id.* (cc'ed on July 7, 2018 email with GDMS about data rights for CHS-5).

Mr. Tarr characterized his role in the CHS-5 negotiations as "extremely limited" and denied having learned "any competitively useful" information.  Compl. ¶ 104; AR 348.  He claimed that, to his "best recollection," he opened the GDMS CHS-5 pricing proposal "at least one time," but that he only read it for "less than a minute or two."  AR 346.  Mr. Tarr also claimed that he never read other sections of GDMS's bid with proprietary information, despite signing the SSAC memo containing such information.  Compl. at ¶ 104.

In August 2020, nine months after his retirement from the Army, CACI recruited Mr. Tarr to consult for its planned CHS-6 bid.  AR 618.  Mr. Tarr said he needed to wait at least a year after his retirement from the government before performing defense-related consulting.  *Id.*  Six months later, CACI reached out again, at which time Mr. Tarr accepted.  *Id.*

On March 11, 2021, Mr. Tarr joined the Defense Contracting Consulting Group, LLC, to work as an independent contractor for CACI.  AR 620–23.  The agreement between Mr. Tarr and

3

the consulting group stated that Mr. Tarr had "no conflicting obligations" from his government service that could "present a conflict of interest." AR 622–23. CACI claims it "expressly limited" Mr. Tarr's contributions to avoid revealing proprietary GDMS pricing information about CHS-5. Compl. ¶ 79.

Although CACI contends that it hired Mr. Tarr for his expertise related to a broad category of military computer technology, Compl. ¶ 78, it appears that he was specifically recruited to consult on the CHS-6 bid preparation. AR 618 ("CACI first contacted Mr. Tarr about the prospect of providing consulting services in connection with CHS-6."). In addition, while CACI argues that CHS-6 was different enough from CHS-5 that previous pricing and technical information would not have been helpful, the CO disagreed. *Compare* Compl. ¶ 79 ("CACI also believed that pricing and technical data from CHS-5 were not useful or relevant to CHS-6 given the passage of time and the differences between the procurements."), *with* AR 1046 ("CHS-5 and CHS-6 are similar enough that the knowledge from CHS-5 would be competitively useful for CHS-6.").

   C.   **Army Investigation**

On October 25, 2021, between the last RFI and the release of the first draft solicitation, Mr. Tarr joined the CACI team for a conversation with Army officials about the CHS-6 procurement. AR 524. On November 2, 2021, Mr. Tarr joined the CACI team for an industry-government event at Aberdeen Proving Ground, Maryland. AR 489. Mr. Tarr spoke to an Army official with whom he had previously worked and who told him to beware of potential conflicts of interest. AR 958.

The CO recognized Mr. Tarr at the October 25, 2021 meeting—the "triggering point for the entire affair." Tr. 7; AR 489. Afterwards, the CO met with xxxxx, Army Contracting Command branch chief, and xxxxx, the new product lead for CHS, to discuss whether Mr. Tarr's consulting might give CACI an unfair advantage. *Id.* They advised the CO to collect more information without beginning a formal investigation. *Id.* However, in December 2021, GDMS wrote a letter formally voicing concern that Mr. Tarr might divulge propriety information and asked the CO to investigate. *Id.* An investigation began shortly thereafter. *Id.*

On December 12, 2021, nine months after beginning his consulting contract, Mr. Tarr contacted an Army ethics lawyer with questions about his responsibilities as a former government official working as a defense industry consultant. AR 932–33. After a different Army ethics attorney provided information about the rules for former officials, and asked him to provide additional information, Mr. Tarr instead wrote back on December 23 that "I will not be taking a permanent position with CACI or entertain[ing] any other opportunities with Defense contractors." AR 929–30. Mr. Tarr did not mention that he had begun consulting months before. *See id.* On January 18, 2022, Mr. Tarr ended his consulting position and retired. AR 498.

The CO interviewed or corresponded with more than a dozen individuals during his investigation: Mr. Tarr, his former coworkers, current and former GDMS employees (some of whom worked with Mr. Tarr), technical experts from the CHS office, Army Contracting Command, and Army legal counsel. AR 489–90. He received numerous interview responses in late February 2022. AR 490. By the end of February, he had also prepared specific questions and forwarded them to Michael Harris, GDMS Senior Director of Contracts. *Id.*

On April 18, 2022, the CO sent a "notice of concern" to CACI. AR 609. The letter noted that CACI could be excluded from the competition for obtaining an unfair advantage. *Id.* The CO asked CACI to respond to a series of questions about Mr. Tarr's work with the company and whether Mr. Tarr disclosed any proprietary GDMS information. AR 609–10. The CO also sent Mr. Tarr a letter requesting information about his access to GDMS proprietary information as a government employee and his consulting with CACI. AR 612–14.

CACI responded to the CO's letter on May 3, 2022, and refuted the alleged unfair advantage. AR 329. According to CACI, Mr. Tarr stopped managing CHS-5 almost two years before CACI hired him and never worked on CHS-6. AR 332; *see* Compl. ¶¶ 96, 101. CACI noted that Mr. Tarr did not provide any pricing information about past CHS contracts, and that he "would recuse himself from" any discussions about CACI's pricing strategy for CHS-6. AR 332–33. Rather, CACI said that Mr. Tarr contributed by bringing his knowledge of the government's processes and what solutions might interest the government. AR 332–33 ("At times Mr. Tarr would help clarify requirements identified in the CHS-6 RFI, draft [Performance Work Statement], and other government provided materials as well as answer team questions regarding workflow, drawing upon his CHS-5 experience."). The response did not "identify any formal actions" that CACI took to prevent Mr. Tarr's assistance from creating an unfair competitive advantage, except for referencing the provision in Mr. Tarr's contracting agreement that said he had no conflicts of interest. AR 5257; *CACI Inc.-Fed.*, B.421224 *et al.*, at *7 (Comp. Gen. Jan. 23, 2023).

By August 24, 2022, the CO made a preliminary determination that CACI possessed an unfair advantage or the appearance thereof. AR 505. The preliminary determination was laid out in an internal thirty-nine-page memo with more than fifty referenced attachments. AR 483–88. The CO proposed that CACI be excluded from the CHS-6 competition. AR 505. This preliminary determination suggested that Mr. Tarr had access to non-public, proprietary GDMS information that would give CACI an advantage and Mr. Tarr had "likely" provided that information to CACI. AR 518–19. The CO did not credit Mr. Tarr's contrary representations for two reasons: (1) some of his claims were "directly contradicted by" others; and (2) when given the opportunity by an Army ethics attorney, Mr. Tarr did not provide "all of the relevant facts." AR 515–16.

The CO summarized his findings in a three-page letter to CACI on August 24, 2022. AR 964–66. The letter warned CACI that it could be excluded from the competition "absent additional information." AR 964. The CO did not specify what information CACI could provide to prevent its exclusion but did request that CACI's response include a mitigation plan. AR 966 ("I will withhold my final determination until such time as CACI provides its response, if any, to this letter, to include any proposed mitigation plan it may elect to submit.").

CACI responded on September 6, 2022, in an eighteen-page letter. AR 967–84. Accompanying the letter were two new declarations: one from a CACI executive and another from Mr. Tarr contesting the CO's preliminary findings. AR 986, 1017. Plaintiff claimed that Mr. Tarr did not participate in any pricing discussions for its CHS-6 bid. AR 978. Mr. Tarr said that although he had opened a GDMS pricing chart while working for the Army, he had not fully read it. AR 1019. He also stated that apart from that one instance, he did not access proprietary GDMS strategy information as a government employee. *Id.* CACI did not propose a mitigation plan. AR 5258. Nor did CACI ask to be provided with any underlying evidence that the CO

5

might have gathered or relied upon to form his conclusions. *See* AR 967–84. CACI did ask for a meeting with the Army, AR 983, but this request was declined, Compl. ¶ 118.

On October 7, 2022, the CO affirmed his preliminary findings and released a final decision to exclude CACI from the competition. AR 1039. The CO incorporated CACI's response to the preliminary determination into the analysis of the final decision. AR 1043. The final decision was twenty-five pages long, with more than seventy referenced attachments. AR 1036–60. As with the preliminary determination, the CO did not send CACI the full final decision that detailed his evidence; instead, the CO provided CACI a four-page summary. AR 4169–72.

### D.   GAO Protest

CACI protested its exclusion with the Government Accountability Office ("GAO") on October 17, 2022. *CACI Inc.–Fed.*, B.421224 *et al.* (Comp. Gen. Jan. 23, 2023). Over the course of its GAO protest, CACI discovered the extent of the CO's investigation, including the unabridged preliminary and final decisions. Compl. ¶ 124. Despite its exclusion, CACI submitted an offer for the CHS-6 program pending resolution of its protest before the GAO. *CACI Inc.–Fed.*, B.421224 *et al.*, at *9.

The GAO denied the protest on January 23, 2023. *Id.* at *1. It found that the Army reasonably excluded CACI on the grounds that Mr. Tarr provided CACI an unfair competitive advantage. *Id.* at *10. The GAO also concluded that, contrary to CACI's assertions, the Army CO properly warned CACI of his concerns. *Id.*

## II.   Procedural History

CACI filed its Complaint in this Court on March 6, 2023. The Defendant-Intervenors moved to intervene on March 13. Mot. to Intervene, ECF No. 14. The Government submitted the Administrative Record on March 31. CACI filed its Motion for Judgment on the Administrative Record the same day. Defendant and Defendant-Intervenors then cross-moved for judgment on the administrative record on April 21.

CACI responded to the Defendant's and Defendant-Intervenors' cross-motions on May 9, after which Defendant and Defendant-Intervenors replied. Pl.'s Resp. to Def. and Def.-Int.'s Cross-Mots. J. on the Administrative Record, ECF No. 47; Def.-Int.'s Reply Supp. Cross-Mot. J. on the Administrative Record, ECF No. 50; Def.'s Reply Supp. Cross-Mot. J. on the Administrative Record, ECF No. 51.

On May 23, 2023, CACI requested that the Court permit supplemental briefing on how a recent Federal Circuit decision—*CACI, Inc.–Fed. v. United States*, 67 F.4th 1145 (Fed. Cir. 2023)—might affect this case. Pl.'s Mot. Am. Schedule, ECF No. 52. The Court granted this Motion the next day and requested that Defendant and Defendant-Intervenors brief the same question. Order Granting Mot. Am. Schedule, ECF No. 54. CACI submitted its supplemental brief on May 24. Pl.'s Supp. Mem., ECF No. 55. Defendant and Defendant-Intervenors filed their responses to the supplemental briefs on May 30. Def.-Intervenor's Resp. to Pl.'s Supp. Mem., ECF No. 56; Def.'s Resp. to Pl.'s Supp. Br., ECF No. 57. On June 22, 2023, the Court heard oral argument on the motion and cross-motions for judgment on the administrative record. *See* Tr.

### III. Standard of Review and Jurisdiction

The Court of Federal Claims has jurisdiction over protests by "an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  The Court reviews whether an agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 28 U.S.C. § 1491(b)(4) (directing the Court of Federal Claims to review agency decisions pursuant to 5 U.S.C. § 706).  In practice, a decision is "set aside if (1) the procurement official's decision lacked a rational basis or (2) the procurement procedure involved a violation of regulation or procedure." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citations and internal quotations omitted).

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). *See, e.g.*, *Trace Sys. Inc. v. United States*, 165 Fed. Cl. 44, 56 (2023).  Disposition of a bid protest at this stage requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005); *Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 751 (2012) ("Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record.").

### IV. Discussion

This case presents two questions: (1) was the Army's process to exclude Plaintiff from the procurement arbitrary or contrary to law, and (2) was the substance of its ultimate decision to exclude Plaintiff arbitrary or contrary to law?  The answer to both is no.

#### A. The Process to Exclude CACI Was Not Arbitrary or Contrary to Law.

Plaintiff first contends the Army's process violated the FAR and APA.  Compl. ¶¶ 195, 200.  Starting with the FAR, CACI primarily takes issue with the agency's delay and CACI's opportunity to respond.  Pl.'s Mot. at 26–27.  It also grafts those arguments onto an APA claim addressing both arbitrariness and due process. *Id.* at 33–34.

##### 1. There Was No Undue Delay.

On the matter of delay, FAR 9.504(a)(1) instructs contracting officers to identify and evaluate conflicts "as early in the acquisition process as possible."  FAR 9.504(d) also counsels against "creating unnecessary delays."  The CO's investigation did not create an unnecessary delay.

The parties have dramatically different perspectives on the investigation.  Plaintiff claims the Army (1) failed to present "any concerns" about Mr. Tarr's presence at the October 2021 meeting; (2) sat on GDMS's December 8, 2021 complaint about his presence and participation for two months until February 2022; (3) conducted a "scant" investigation of the October 2021 meeting between February and March 2022; (4) waited yet another month until April 2022 to confront CACI; and (5) delayed a final determination until one hour before the final solicitation was issued in October 2022. *Id.* at 30–31.

On nearly every point, the Government disagrees.  The contracting officer (1) "immediately met with members of the [Army Contracting Command] and CHS" to discuss Mr. Tarr's presence at the October 2021 meeting; (2) launched a "formal investigation" upon receipt of GDMS's notice of concern; (3) "worked diligently" to investigate a potential conflict, "interviewed Mr. Tarr, [g]overnment employees, and former GDMS employees," requested documents from GDMS, formulated questions to ask CACI, and "consulted with technical experts from CHS, [Army Contracting Command], and Army legal counsel"; (4) notified CACI in April 2022 "as soon as [he] had sufficient information and evidence"; and (5) labored between receipt of CACI's response in May 2022 and his final determination in October 2022 to compile a thirty-nine-page internal preliminary determination and, after CACI's response, an additional twenty-five-page internal final notice of exclusion.  Def.'s Mot. at 19–20.

Faced with an identical record, Plaintiff consistently disparages the Army's investigation.  *See* Pl.'s Mot. at 12 ("For over a month, CACI heard nothing."), 14 ("[T]he [contracting officer] conducted a dilatory and incomplete investigation [and] . . . did nothing to investigate any supposed unfair competitive advantage."), 23 ("Next to nothing happened in the investigation from May 3, 2022 forward."), and 31 ("Essentially nothing happened in the investigation.").

However, the factual record makes clear that the CO's investigation was appropriate.  Mr. Tarr's presence at the October 25, 2021 one-on-one market research presentation immediately raised eyebrows.  AR 489.  The CO then met with xxxxx, a branch chief at Army Contracting Command, and xxxxx, product development lead for CHS, to "discuss CACI's apparent utilization of Mr. Tarr on the CHS-6 effort."  *Id.*  The three agreed to "gather more information."  *Id.*  This informal inquiry changed once GDMS senior counsel formally voiced issue over Mr. Tarr's involvement in a December 2021 letter.  AR 537.  As evidence of his involvement, GDMS noted that Mr. Tarr attended a Fall Tech Exposition at Aberdeen Proving Ground, wore a CACI shirt ("lest there be any question as to whom he was representing"), conveyed his consultancy with CACI, and "alongside CACI employees [spoke] with the current CHS contracting officer."  *Id*.  As such, GDMS "ask[ed] that [the CO] investigate."  AR 538.

The first signs of a formal investigation emerged in late February 2022 when the CO received numerous interview responses.  AR 490.  Questions included how long interviewees had worked in their roles, whether they worked with Mr. Tarr, how involved Mr. Tarr was with the details of the CHS program, and which government officials had access to proprietary information.  AR 643–45.  Presumably, the CO prepared those questions well before he received responses from xxxxx (February 18), xxxxx (February 18), William Gehrum (February 20), Nicolas Kalish (February 22), xxxxx (February 22), and Melinda Salin (February 23).  AR 490.  By the end of February, the CO had also prepared specific questions and forwarded them to Michael Harris, GDMS Senior Director of Contracts.  AR 489.

March and April 2022 were similarly active.  Mr. Harris responded to the CO's questionnaire with multiple exhibits.  AR 490.  Kevin Johnson, former director of CHS for GDMS, responded on April 15.  *Id.*  Shortly thereafter the CO sent a notice of concern to CACI notifying it of potential unfair competitive advantage "by virtue of Mr. Tarr's support" (April 18) and a letter to Mr. Tarr "requesting information related to the investigation" (April 19).  AR 609–11, 612–14.

Two weeks later, on May 3, CACI and Mr. Tarr responded.  *Id.*  By mid-May, Catherine Neil—CHS task order team lead—also responded to her interview questions.  *Id.*  Between

receipt of CACI's response and the August 24, 2022 preliminary determination, the CO reviewed additional interview responses which arrived in June from David Bogert and xxxxx. *Id.* Between May and August, the CO conferred with the Chief of the Contracting Office, his own support team, "including the Army legal office, members of the CHS program technical team, and members of the [Army Contracting Command] cost and pricing experts," Def.'s Mot. at 20, and compared CHS-5 and CHS-6, *see* AR 20–21, 489–91.

In sum, the CO collected and reviewed 442 pages of interviews, emails, letters, declarations, meeting minutes, and memoranda between February and August 2022. AR 522–963. What Plaintiff casts as a "delay" in the process is more accurately characterized as the process itself. Put simply, there was no undue delay.

### 2. Meaningful Opportunity to Respond

The CO also provided CACI with a "meaningful opportunity to address his real concerns." Pl.'s Mot. at 31. Formally, that opportunity began when the CO sent his notice of concern on April 18, 2022. AR 609–11. In it, he sought "information from CACI on a potential [FAR] Part 3 unfair competitive advantage that CACI may have in the upcoming CHS-6 formal source selection due to its alleged employment of Mr. Breck Tarr." *Id.* He detailed when the issue first "c[a]me to the Government's attention" (the October 25, 2021 meeting) and when suspicion became investigation (the November 2, 2021 Fall Tech Exposition). *Id.* The CO then requested extensive information from CACI concerning Mr. Tarr's employment and involvement with CHS-6. AR 325–27.

Certainly, CACI's fifteen-page response on May 3, 2022, was more than meaningful. *See* AR 329–43. By CACI's own admission, it "underst[oo]d that [the CO was] seeking information regarding Breck Tarr's activities relating to CACI's CHS-6 capture effort in order to determine if CACI obtained an unfair competitive advantage." AR 329. Plaintiff now claims the CO's notice "did not reveal to CACI his concerns . . . [and] withheld the deep concerns he had developed." Pl.'s Mot. at 31. Not only did the CO reveal his concerns, CACI spent five pages answering each ad seriatim and appended ten pages of exhibits to assert, in part, that "Mr. Tarr had no role, responsibility or participation in the CHS-6 procurement." AR 329.

Plaintiff's position on this matter appears to stem from an unspoken argument that the CO acted pretextually on behalf of GDMS. Pl.'s Resp. at 2–3 ("GDMS' instigation of the investigation was clearly self-motivated and had the express purpose of eliminating CACI. . . . The Agency did GDMS' bidding."). No dice. *Rd. & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1369 (Fed. Cir. 2012) ("[A] challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a specific intent to injure the plaintiff by clear and convincing evidence." (quotation marks omitted)).

Plaintiff again meaningfully responded on September 6, 2022, to the CO's notification of preliminary decision. AR 967–1035. CACI submitted an eighteen-page response and included seven exhibits—sixty-nine pages in total. *Id.* This response addressed a majority of the issues presented here: delay, AR 967, the "rational connection" between investigation and exclusion, AR 969 (citing *Oak Grove Tech., LLC v. United States*, 155 Fed. Cl. 84, 115 (2021)), the competitive usefulness of information disclosed by Mr. Tarr, AR 971, the propriety nature thereof, AR 972, access to CHS-5 and price information, AR 973–81, and the appearance of an unfair competitive advantage, AR 981–83.

To Plaintiff, none of this sufficed. In part, Plaintiff laments that the CO's preliminary decision was only three pages rather than the full thirty-nine pages comprising the internal investigation document. Pl.'s Mot. at 16. But the CO was not bound to document his preliminary analysis at all, let alone adhere to a page minimum. *Turner Const. Co. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011) ("Section 9.504(a) does not require that this preliminary analysis be documented in writing."). The three-page August 24, 2022 letter summarized all the relevant information for Plaintiff and alleged access to GDMS proprietary information, the competitive usefulness of said information, and the likely disclosure thereof. AR 360–361. The CO satisfied all that was required of him. Plaintiff not only had the opportunity to meaningfully respond, it did so.

Additionally, CACI argues that the CO harbored "secret suspicions" and relied on "innuendo" alone. Pl.'s Mot. at 38. The CO's analysis was far from "secret." On the contrary, the record before this Court is replete with reasoned analysis and enumeration. The CO could not have been clearer from the get-go. *Compare* AR 325 (April 18, 2022 notice of concern) ("I must determine whether CACI may have obtained an unfair competitive advantage if it hired a former government employee with knowledge of non-public information.") *with* AR 360 (August 24, 2022 preliminary decision) ("This letter is to inform CACI . . . [that] Mr. Breck Tarr . . . creates, at a minimum, the appearance of an unfair competitive advantage.") *and* AR 1039 (October 7, 2022 final determination) ("I have determined that CACI may have obtained an unfair competitive advantage.").

Plaintiff also takes issue with the content of the CO's April 2022 letter and August 2022 preliminary decision. Pl.'s Mot. at 31–32. It claims that omitted concerns robbed it of the opportunity to meaningfully respond. *Id.* According to CACI, the Army's final decision placed dispositive emphasis on Mr. Tarr's credibility. *Id.* But CACI claims it never had the opportunity to respond to credibility concerns because those considerations first featured in the CO's final decision. *Id.* Plaintiff misunderstands the CO's credibility determination. The reason for exclusion was not Mr. Tarr's credibility. Credibility was merely a factor under consideration when weighing a subset of evidence (Mr. Tarr's narrative) against the rest. If Plaintiff were correct, the FAR would create a right to meaningfully respond to both the reasons for exclusion and evidentiary concerns like credibility. The FAR does no such thing.

The CO need only "allow the contractor a reasonable opportunity to respond" to "the reasons" for "withhold[ing] award based on conflict of interest considerations." FAR 9.504(e). Plaintiff may or may not have had an opportunity to respond to the CO's credibility determination. Either way, it is of no moment. The CO did not exclude CACI because Mr. Tarr was incredible. The CO excluded CACI because Mr. Tarr "had access to non-public and proprietary competitively useful information," AR 1044, "likely . . . passed [that information] to CACI," AR 1055, and "created an appearance of unfair competitive advantage," AR 1058. Those were the exact types of "reasons" envisioned by FAR 9.504(e).

CACI responded to each of these reasons. AR 1096 ("The 'hard facts' demonstrate that whatever . . . proprietary information GDMS conveyed to the Government in performing CHS-5, it is simply not competitively useful to an offeror on CHS-6."), 1094 ("This conclusion [that Mr. Tarr 'likely disclosed' proprietary information] does not recite any facts and circumstances showing that Mr. Tarr actually disclosed any such information to CACI. Both CACI and Mr. Tarr denied that ever occurred."), and 1108 ("[I]t is not reasonable to conclude that CACI's use

10

of Mr. Tarr created the appearance that CACI gained access to GDMS non-public, proprietary information.").

Notably, Plaintiff never responded to the CO's entreaty to develop a mitigation plan in August 2022. AR 362 ("However, I will withhold my final determination until such time as CACI provides its response, if any, to this letter, to include any proposed mitigation plan it may elect to submit."). Instead, CACI retroactively points to an earlier investigation to excuse its lack of mitigation. Pl.'s Mot. at 25. In October 2021, an employee for one of CACI's subcontractors— xxxxx—emailed a confidential document to CACI's CHS-6 capture team. AR 442–69, 640–41. CACI immediately identified the document as off-limits, reported it to the CO, and controlled for damage alongside the CO. AR 471. It also documented that the email was promptly removed from the system and gathered signed statements from employees confirming they had not opened the email. *Id.* Put simply, CACI mitigated to avoid fallout from the xxxxx investigation. As a result, the CO found that CACI did not obtain an unfair competitive advantage. *Id.*

CACI claims its experience with xxxxx put its employees on notice. Tr. at 21:1–5 ("[CACI employees] have these understandings and they're well trained and have proper internal controls, and this is really the more important part from CACI's perspective that people on the CACI side knew, we don't want to be anywhere near that kind of thing."). "Understanding" is not a mitigation plan. The fact that "the same CACI capture team was clearly capable of . . . recogniz[ing] and resolv[ing]" the xxxxx conflict highlights CACI's failure to do so here. Pl.'s Mot. at 25. If anything, the xxxxx experience should have sensitized CACI to the need for formal mitigation procedures. It did not. *See* Tr. 17:9–11 ("[T]here was not a formal memo that says here are the particular rules of the road."), 21:6–7 ("So was there a formal memo that wrapped it all up into one thing with Tarr? No."). Instead, the earliest documentation of CACI's post- xxxxx mitigation procedure comes by way of its GAO protest. AR 65 ("[The xxxxx] incident demonstrated that CACI was well-equipped to detect, report, and react appropriately to potential conflicts of interest and unfair competitive advantage situations.").

In part, CACI claims the CO did not give them enough time to respond because he did not explicitly request a mitigation plan until August 24, 2022, just over a month before he released the solicitation. Tr. 45:13–14 ("CACI thought that it would be futile at that point to try to mitigate."). But if CACI was already aware of its responsibility to implement mitigation procedures and communicate the plan to the CO, it is unclear why it would have required the CO's explicit request to be on notice. The April 18, 2022 notice of concern should have been sufficient to prompt a mitigation plan. *See* AR 325–27 ("Please attach any documentation or correspondence related to the above listed questions with your response. CACI may also provide any additional information it deems relevant to this investigation for government review and consideration."). And if it had already followed its usual mitigation plan but merely failed to communicate with the CO, CACI could have responded to the August 24, 2022 preliminary determination by detailing this plan and providing documented evidence similar to that provided with xxxxx. Instead, in its September 6, 2022 response, CACI faulted the CO for his failure to come up with a mitigation plan. AR 968 ("[T]he contracting officer took no action to implement a mitigation plan, which is what the FAR requires if there is a significant potential conflict.

11

FAR § 9.504(a)."). Despite CACI's protestations to the contrary, the FAR does not speak to this requirement. The onus was on CACI to mitigate.

Of note is the fact that Mr. Tarr worked for CACI prior to the xxxxx investigation. Even if CACI had implemented—and documented—strict mitigation procedures after xxxxx, Mr. Tarr was under CACI's employ for seventh months prior to the xxxxx investigation. AR 442–69, 618–23.

Lurking in the background is the possibility that FAR 9.504(e) is inapplicable to the current protest. The Government argues as much. The language in FAR 9.504(e) is relatively straightforward: it applies to "apparent successful offeror[s] . . . [b]efore determining to withhold award." *See A Squared Joint Venture v. United States*, 136 Fed. Cl. 321, 331 (2018), *reconsidered on other grounds*, No. 17-835C, 2018 WL 2106632 (Fed. Cl. May 1, 2018) ("FAR § 9.504(e) applies only when an apparent successful offeror has been identified."). CACI was not an apparent successful offeror, and its exclusion came well before any decisions to withhold/award the contract. The CO excluded CACI before it had even bid on the solicitation.

To resolve this question, the Court requested supplemental briefing on a recent Federal Circuit decision which Plaintiff claims vitiates Defendant's reading of FAR 9.504(e). *CACI, Inc.–Fed.*, 67 F.4th at 1145. It does not. Unlike the instant case, in which CACI brings a pre-award protest after first filing at the GAO, the recent ruling concerned a post-award bid protest that was first filed before the Court of Federal Claims. *See CACI*, 67 F.4th at 1149. CACI lost an unrelated, Army information technology contract due to technical deficiencies in its proposal. *Id*. at 1148–49. When the company protested before the Court of Federal Claims, the Army argued—for the first time—that CACI was also ineligible due to an organizational conflict of interest. *Id*. at 1149. The Court of Federal Claims "conducted its own analysis of the record evidence" on this issue and determined that there was a conflict of interest and that CACI thus lacked statutory standing. *Id*. at 1150.

The Federal Circuit vacated this portion of the Court of Federal Claims' decision for "erroneously conduct[ing] a de novo review" of the alleged conflict of interest and statutory standing. *Id*. at 1153. The *CACI* panel clarified that statutory standing is not a jurisdictional question. *Id*. at 1151–52. The Court of Federal Claims erred by reviewing the issue de novo when the CO failed to analyze the facts of the alleged conflict of interest. *Id.*

CACI argues that the recent ruling supports its claim that FAR 9.504(e) applies to pre-solicitation exclusions of offerors. Pl.'s Suppl. Mem. 2, ECF 55. But the Federal Circuit only cited that sub-section to illustrate that the Court of Federal Claims should remand factual questions statutorily within an agency's discretion. *CACI*, 67 F.4th at 1154 ("In general, a declaration from a contracting officer as to how she would resolve the case is no substitute for a remand where the challenging party would have a full opportunity to present the case to the contracting officer."). Whether FAR 9.504(e) applies to pre-solicitation exclusions of offerors is not addressed. *See id*.

### 3. Arbitrariness and Administrative Procedure Act Claims

CACI recycles its FAR arguments to allege that the Army's process violated the APA in two ways: "the investigation process . . . [was] arbitrary . . . and contrary to the requirements of the [APA]," and "violated the due process requirement under the APA." Compl. ¶¶ 196, 198.

To succeed on its claim that the Army acted arbitrarily, CACI "bears a heavy burden of showing that the [process] had no rational basis." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004). For the foregoing reasons, the Army's process went beyond what was required of it. *Supra* Part IV.A(1)–(2). The Army's investigation was sufficiently rational to survive the APA's arbitrariness standard.

The APA's due process standard is even lower. The process required by the APA before a decision to exclude must meet the same test that applies to a procedural due process challenge to agency action. *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 767 (2006); *see Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655–56 (1990) (holding that the APA § 555 protections for informal adjudications correspond to procedural due process). Thus, the agency must provide "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks removed). An agency fails the *Mathews* test only when it does "not provide any notice to [the plaintiff] or opportunity [for the plaintiff] to be heard." *Sys. Plus*, 69 Fed. Cl. at 767. The Army furnished CACI with enough notice (April 2022 letter; August 2022 preliminary determination) and opportunity to respond (May 2022 response; September 2022 response) to survive Plaintiff's attack on its exclusion process. In the same vein, its undue delay argument under the APA fails because there was no undue delay.† *Supra* Part IV.A(1).

The GAO protest alone satisfies the due process standard. *See NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 377 (Fed. Cir. 1986). In *NKF Engineering, Inc. v. United States*, the plaintiff unsuccessfully argued that its exclusion deprived it of "due process at the administrative level." *Id.* (citing *NKF Eng'g, Inc. v. United States*, 9 Cl. Ct. 585, 607 n.7 *vacated on other grounds*, 805 F.2d 372 (Fed. Cir. 1986)). There, "the protest procedures before the [GAO's predecessor] . . . were certainly sufficient to satisfy any due process requirement." *NKF Eng'g, Inc.*, 9 Cl. Ct. at 607 n.7. Similarly, in *Compliance Corp. v. United States*, the Claims Court held that GAO proceedings "gave the bidder an opportunity to be heard at a meaningful time and in a meaningful manner." 22 Cl. Ct. 193, 205 (1990), *aff'd*, 960 F.2d 157 (Fed. Cir. 1992) (internal quotations removed).

In both *NKF Engineering* and *Compliance*, the plaintiffs were "not given an opportunity to respond to [the agency's] charges against [them] or challenge [the investigation] before the contracting officer disqualified [them]." *Id.*; *NKF Eng'g, Inc.*, 805 F.2d at 377 ("NKF argues that the government's formal decision to disqualify was not received by NKF until after the decision was made."). "Participation in a protest hearing conducted by the GAO" satisfies

---

† The parties also briefed the issue of prejudice. Def.'s Mot. at 31. Prejudice need only be assessed if the protestor successfully alleges an error. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) ("First . . . the trial court determines whether the government acted without rational basis . . . . Second, . . . if the trial court finds that the government[] [acted arbitrarily or irrationally], then it proceeds to . . . prejudice[].").  Finding no error, the Court sees no reason to review potential prejudice.

13

*Mathews*.  *Id.*  Here, there is certainly no want of due process after a notice of concern, preliminary determination, final decision, and a GAO protest.

Following oral argument, the parties submitted supplemental briefing on whether *NKF Engineering* remains good law.  Def.-Intervenor's Suppl. Brief, ECF No. 60; Def.'s Suppl. Brief, ECF No. 61; Pl.'s Suppl. Brief, ECF No. 62.  Plaintiff argues the legal "landscape has changed" since the *NKF* decision.  Tr. 50:6–7.  Specifically, it emphasizes that the Federal Circuit decided *NKF Engineering* before key amendments to the FAR.  *Id.*  Indeed, FAR 9.504 was amended four years after the *NKF Engineering* decision to include 9.504(e).  55 Fed. Reg. 42684, 42686 (Oct. 22, 1990).  On October 22, 1991, Congress again amended the provision to include language requiring the CO to "provide the reasons" for disqualification.  56 Fed. Reg. 55376, 55376 (Oct. 25, 1991).  Those amendments, however, do not vitiate *NKF Engineering*'s due process holding.

Plaintiff loses its argument on two grounds.  First, the Court of Federal Claims and other courts applied *NKF* after the 1990 and 1991 amendments to the FAR.  *Compliance Corp.*, 22 Cl. Ct. at 205; *QualMed, Inc. v. Off. of Civilian Health & Med. Program of Uniformed Servs.*, 934 F. Supp. 1227, 1243 (D. Colo. 1996).  In those post-amendment cases, a protest before the GAO satisfied due process.  Second, *NKF Engineering* addressed procedural due process, *NKF Eng'g Inc.*, 805 F.2d at 377, and, regardless of the FAR amendments, still has bearing on Plaintiff's due process claims, Pl.'s Mot. at 8 ("[T]he investigation . . . violated . . . fundamental elements of due process.").  That legal landscape has not changed.  *NKF Engineering* applies.

B. The Decision to Exclude CACI

Plaintiff next challenges the substance of the decision.  This Court can only reverse CACI's exclusion if it was arbitrary or contrary to law.  *See Oracle America, Inc. v. United States*, 975 F.3d 1279, 1296 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 68 (2021) ("If the contracting officer's findings are rational, they will be upheld on judicial review."); *NKF Eng'g Inc.*, 805 F.2d at 376 ("Under the facts at issue here, we cannot say that the agency's conclusion, that there was an appearance of impropriety, was unreasonable or irrational.").  This Court's review is "highly deferential" to "a contracting officer's decision with regard to a conflict of interest."  *Oracle*, 975 F.3d at 1296.  But for irrationality, a CO's conflict of interest determination will be upheld on judicial review.  *NKF Eng'g Inc.*, 805 F.2d at 376.

The record suggests the CO's decision was rational.  The CO complied with language in the FAR and thoroughly investigated violations thereof.  The FAR instructs that "[t]he general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships."  FAR 3.101.

The latter consideration—the appearance of a conflict—was affirmed by the Federal Circuit as a legitimate reason to eliminate a potential offeror from competition.  *See NKF Eng'g, Inc.*, 805 F.2d at 376 ("Whether or not inside information was actually passed from [the former official] to [the plaintiff], the appearance of impropriety was certainly enough for the CO to make a rational decision to disqualify [the plaintiff]."), 377 ("When a CO perceives a strong appearance of impropriety . . . it would undermine Congressional concern in the conflict of interest area to tie the hands of the CO.").  The CO obliged both Federal Circuit precedent and GAO practice, *Serco, Inc.*, B-419617.2 *et al.*, 2021 WL 6333688, at *9 (Comp. Gen. Dec. 6, 2021) ("[W]here an offeror [hires] former government officials who have had recent access to

competitively useful information, and uses those officials to assist in proposal preparation effort, [we] assume that the offeror benefited from the information . . . disqualification is appropriate based on the appearance of an unfair competitive advantage alone."), when he found the appearance of impropriety, AR 92 ("There are sufficient hard facts to show that Mr. Tarr's support to CACI created an appearance of unfair competitive advantage.").

Mr. Tarr's involvement has a "certain aroma that is hard to purify." *NKF Eng'g, Inc.*, 805 F.2d at 377. Over the course of his investigation, the CO found more than the mere appearance of a conflict. Section 9.505 wards against two genres of conflict: (1) "the existence of conflicting roles that might bias a contractor's judgment," FAR 9.505(a); and (2) "unfair competitive advantage," which may occur when a contractor competing for an award possesses "[p]roprietary information that was obtained from a Government official without proper authorization," FAR 9.505(b).

The operative question is whether "Mr. Tarr had access to non-public information during his tenure with the Army that [was] still competitively valuable for the CHS-6 competition." Def.-Int.'s Mot. at 39. The CO rationally concluded Mr. Tarr had access to non-public, proprietary, competitively useful information. AR 1043–55, 5163–65. In fact, Mr. Tarr admitted he accessed such information:

> I generally recall having access to some GDMS-specific information through files sent to me and possibly saved on my government issued laptop at some unknown point in time. I do not recall if the GDMS information that was generally accessible to me was proprietary, non-public, and/or competition sensitive information. I do recall that GDMS's pricing proposal for CHS-5 was accessible to me at some point in time. My best recollection is that I opened the GDMS pricing proposal at least one time. I recall scanning that information one time for less than a minute or two.

Compl. ¶ 103.

CACI attempts to underplay his admission, stating that "Mr. Tarr took no information with him when he left the government and any information he might recall from his time in Government would have been stale." Pl.'s Mot. at 38. The CO's standard to find a conflict of interest, however, is not the physical relocation of government information. *See id.* ("Mr. Tarr took no information with him."); Def.'s Mot. at 29 ("CACI cites no authority for the proposition that an unfair competitive advantage can only exist if a former employee physically takes information when they leave."). Nor is the standard whether a former employee can effectively "recall" the information.

The standard is access, and Mr. Tarr had it. *See, e.g.*, AR 608 (showing access to the GDMS Secure File Transfer System), 644 (showing access to GDMS proposals via the government's Sharepoint site), 654 (showing access to GDMS documents detailing technology insertion and task order proposals with price information), 544 (revealing that Mr. Tarr reviewed all technical insertion and task order proposals with access to GDMS material cost and proposed cost specifics), 563 (noting that Mr. Tarr participated in GDMS price negotiations for CHS-5 with access to GDMS's CHS-5 cost element buildup and five-year pricing schedules valid through August 2023), and 766–73 (showing access to GDMS proposed material costs across product categories in his role as chair in source selection for CHS-5).

CACI argues that it "insulated against any issue related to such GDMS pricing information by excluding Mr. Tarr from any pricing discussion or discussions related to GDMS." Pl.'s Mot. at 38. The record suggests otherwise. For instance, CACI prepared a "slide deck" to describe its approach to pricing and cost savings for the CO. AR 1063 (including an agenda with "Cost/Price Control" as an item, AR 1062, and a note that "conversations are needed to understand how [price] would be evaluated in the CHS-6 proposal," AR 1071). Mr. Tarr's name and face featured on the Program Teams slide in the presentation. AR 1063. He also attended a one-on-one meeting with the Army in his role as Deputy Program Manager. AR 1075–77. During this meeting, the CACI presenters discussed "pricing xxxxx," "cost sharing and fixed-price incentives," "xxxxx to facilitate cost savings," and "pricing structure." AR 1076–77. Mr. Tarr even "huddle[d]" with the CACI team in the meeting during which time pricing discussions may have occurred. AR 1076.

The CO's final determination addressed at length Mr. Tarr's real or apparent involvement in pricing discussions. *See, e.g.*, AR 1056 ("In CACI's 3 May 2022 response to my questions, the company said that Mr. Tarr was tasked to advise and support CACI's Business Development, Capture, and Proposal Teams in connection with the CHS-6 procurement. . . . They added that Mr. Tarr was tasked with helping to build technical solutions to best address the requirements of CHS-6. . . . At times Mr. Tarr would help clarify requirements identified in the CHS-6 RFI . . . and other government provided materials as well as answer team questions regarding workflow, drawing upon his CHS-5 experience." (quotation marks and emphasis omitted)), *id.* (examining changes in Mr. Tarr's job description between May and August 2022), 1057 (focusing on CACI's admission that "GDMS has had the CHS contract for over 25 years, making it difficult, if not impossible, to separate non-public and proprietary information from public information, without consulting the Government or GDMS"), *id.* (expressing the difficulty of mapping Mr. Tarr's involvement onto the "phases" of CACI's procurement timeline), *id.* (noting that Mr. Tarr engaged in CHS-6 proposal activity, namely: "assisting with CHS-6 PWS review, reviewing CHS-6 RFIs, and creating the CHS-6 One-on-One in October 2021"). Combined, these factors created "reasonabl[e] concern[] about the propriety of [Mr. Tarr's] activities." AR 1056.

In part, CACI criticizes the CO's final determination for not exclusively relying on "hard facts." Pl.'s Mot. at 33. This criticism appeared early in CACI's protestations and remains relatively unchanged before this Court. *Compare id.* ("[T]he CO disbelieved Mr. Tarr . . . and hard facts.") *with* AR 52 (GAO protest) (describing the preliminary determination as "bereft of hard facts") *and* AR 364 (response to preliminary determination) ("This preliminary determination is not reasonable, supported as it is by neither hard facts nor law."). CACI's characterization of the "hard facts" is off base. Certainly, the CO must rely on hard facts—not mere suspicion, *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010)—to exclude a potential offeror. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1387 (Fed. Cir. 2011). But Plaintiff wrongly asserts that the CO should have scoured the record for a smoking gun. *See* Pl.'s Mot. at 41 (quoting AR 1057 (CO's Final Determination)) ("[The CO did not] inquire as to hard facts that the information was actually passed from Mr. Tarr to CACI.") and 10 ("There is no evidence in the Agency record that Mr. Tarr provided CACI any GDMS proprietary information."). In so arguing, CACI wrongly heightens the bar.

Instead, hard facts can (and, here, do) include evidence of information access and participation in prior competitions. *See Trace Sys. Inc. v. United States*, 165 Fed. Cl. 44, 59 (2023) (using evidence of information access by former official hired by contractor as hard facts,

16

even without specific evidence the former official provided that information to contractor); *Michael Stapleton Assocs. v. United States*, 163 Fed. Cl. 297, 322–23 (2022) (using documentation of an individual's prior access to information and participation in competition as hard facts); *NetStar-1 Gov't Consulting v. United States*, 101 Fed. Cl. 511, 520 (2011) (using documented access by contractor's employees to information as hard facts), *aff'd*, 473 F.App'x 902 (Fed. Cir. 2012); *PAI Corp. v. United States*, 614 F.3d 1347, 1353 (Fed. Cir. 2010) (finding no hard facts when plaintiff alleged only a hypothetical way that conflict of interest could arise but without identifying a potential conflict); *Sigmatech, Inc. v. United States*, 141 Fed. Cl. 284, 334 (2018) (finding no hard facts when disappointed offeror failed to demonstrate a situation in which a conflict of interest would occur under the contract but only alleged that a hypothetical conflict could arise in the future); *Aegis Tech. Grp., Inc. v. United States*, 128 Fed. Cl. 561, 573 (2016) (finding no hard facts when disappointed offeror pointed to potential winning subcontractor's involvement in previous version of contract but failed to establish a link between that involvement and the competition's requirements); *Macaulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 604 (2016) (finding no hard facts when CO did not gather information to show that contractor had conflict of interest).

      CACI reiterates its disagreement with the CO's credibility determination—now as a matter of substance in the CO's final decision. The CO's determination revealed a host of inconsistencies between Mr. Tarr's declarations and the rest of the record. AR 1044–45. For instance, in his first declaration, Mr. Tarr claimed he did not have access to proprietary and competitively useful information. AR 633. Other evidence demonstrated that he did, including (1) "statements from GDMS and Government employees that indicated that he was a very hands-on leader and regularly attended meetings where GDMS proprietary information was discussed"; (2) "emails that show Mr. Tarr was privy to GDMS non-public and proprietary information"; (3) "proof that Mr. Tarr had access to the GDMS Dropbox and Sharepoint where GDMS non-public and proprietary information was regularly shared"; and (4) "his role as the Source Selection Advisory Council Chairperson . . . for CHS-5." AR 1044. The CO underwent a similar process for Mr. Tarr's second declaration, compared it to the body of evidence, and found similar inconsistencies. *Id.* at 1044–45.

      These actions show that the CO followed the proper protocol to assess the credibility of key statements. The CO retains considerable discretion to evaluate the evidence, determine whether there is a conflict of interest, and how such a conflict might be mitigated. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009); *A Squared Joint Venture*, 136 Fed. Cl. at 330 (citing *NKF Eng'g, Inc.*, 805 F.2d at 377 ("The Federal Circuit has held that deference is owed to a CO's decision to disqualify a contractor based on the appearance of [organizational conflict of interest].")). CACI would have the CO credit Mr. Tarr's sworn statements as though "sworn" meant unassailable. Pl.'s Mot. at 10 ("This statement remains uncontradicted by any hard facts in the record and was supported by sworn statements."), 31 ("[T]hese concerns were the only basis the CO asserted to disbelieve Mr. Tarr . . . including the sworn statements."), 33 ("[T]he CO disbelieved Mr. Tarr's every statement and disregarded CACI's evidence, including sworn statements."), 35 (verbatim), 37 ("[I]t was refuted by hard facts, including sworn statements."), and 38 ("CACI presented the well-established steps . . . supported with hard facts, including sworn declarations."). Instead, the CO followed proper protocol and measured the evidence furnished by CACI against the evidence gathered in his own investigation. He found reasons to doubt the former and, most importantly, explained them.

17

Part, though not all, of the CO's credibility determination relied on his classification of Mr. Tarr as a "DoD covered official" pursuant to Section 847 of the National Defense Authorization Act for the Fiscal Year 2008. AR 498. In short, "covered officials" must receive a written post-government employment opinion if they wish to work for a defense contractor within two years of leaving the government. Nat'l Defense Authorization Act for Fiscal Year 2008 ("FY-2008 NDAA"), Pub. L. No. 110-181, § 847, 122 Stat. 3, 244. In believing Mr. Tarr to be a covered official, the CO took issue with the absence of a written post-government employment opinion for Mr. Tarr. AR 499.

CACI disagrees. Pl.'s Mot. at 23 ("It is shocking to the conscience."). It argues that Mr. Tarr was not a covered official because his titles were "decidedly not among the specific positions enumerated in Section 847." Pl.'s Mot. at 21 (emphasis removed). Certainly, "Deputy Product Director," "Product Lead," and "Source Selection Advisory Council Chairperson" are not specifically enumerated in Section 847's list of covered officials. FY-2008 NDAA § 847 (Covered officials are those who "serve[] or served as a program manager, deputy program manager, procuring contracting officer, administrative contracting officer, source selection authority, member of the source selection evaluation board, or chief of a financial or technical evaluation team.").

But this is beside the point. Title alone is not dispositive. *Cf.* AR 5171 (explaining that under FAR 3.104-4(d) "a Government employee must perform the functions of a program manager . . . regardless of the title given the individual" and that "there may be more than one employee who performs [the functions of a program manager, still] [t]hese personnel are all considered program managers"). Congress has said that the function, not the official title, defines the role of program manager. 10 U.S.C. § 1737(a)(1). According to his position description, Mr. Tarr was "responsible for managing the program." *See* AR 1554 (Generic job description for Army acquisition product lead included "[a]s the assigned responsible management official, provides overall direction and guidance for the development, acquisition, testing, product improvements, fielding, and sustainment of the project.").

Covered or not, this matter was not dispositive for the CO. First, several other factors led to the CO's credibility analysis besides Mr. Tarr's failure to comply with Section 847. AR 1044–45 (relying upon contradictory interviews, contradictory documents, and contradictions within Mr. Tarr's own statements to assess credibility). Second, credibility aside, the CO could have still determined that Mr. Tarr had access to proprietary information. AR 1045–46 (referencing emails, discussions, and meetings that included Mr. Tarr and mentioned GDMS proprietary information). On this point, Plaintiff makes much ado about nothing: whether Mr. Tarr was "covered" or not, the CO rationally excluded CACI from the competition for a conflict of interest or appearance thereof.

### C. Competition in Contracting Act

Finally, CACI claims that its eleventh-hour exclusion from the competition violated the Competition in Contracting Act. Pl.'s Mot. at 43–44 ("Those actions ensured that CACI lacked time to resolve the Agency's true concerns or mitigate the perceived unfair competitive advantage, and thereby remain in the competition."). The Act mandates "full and open competition through the use of competitive procedures." 10 U.S.C. § 3201(a)(1). Yet CACI does not explain how the exclusion of one competitor for a conflict of interest forestalls

competition.  *See* Pl.'s Mot. at 43–44.  Because there is no logical link between CACI's exclusion and the integrity of the competitive process, this argument fails.

## V. Conclusion

For the foregoing reasons, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.  Defendant's Cross-Motion for Judgment on the Administrative Record is **GRANTED**.  Defendant-Intervenors' Cross-Motion for Judgment on the Administrative Record is **GRANTED**.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge